Filed 12/2/13  P. v. Aguilar CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>EDGAR AGUILAR,<br><br>    Defendant and Appellant. | B240268<br><br>(Los Angeles County<br>Super. Ct. No. LA059320) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Bob S. Bowers, Jr., Judge.  Affirmed.

Catherine White, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr., and David F. Glassman, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Edgar Aguilar and his codefendant Alvaro Aguirre were charged with 10 counts of attempted murder of a police officer (§§ 187, subd. (a), 664 (counts 1-8, 13, 14)),[1] one count of evading the police (Veh. Code, § 2800.2 (count 9 as to Aguilar and count 10 as to Aguirre)), and one count of possession of a firearm by a felon (§ 12021, subd. (a)(1) (count 11 as to Aguilar and count 12 as to Aguirre)). The information included the following allegations: (1) the attempted murders were willful, deliberate, and premeditated (§ 664, subds. (e), (f)); (2) a principal personally used and discharged a firearm during the commission of the attempted murders (§ 12022.53, subds. (b), (c), (e)(1)); (3) all of the crimes were committed with the intent to promote criminal conduct by gang members (§ 186.22, subds. (b)(1)(A), (b)(4)); and (4) defendant had served prior prison terms (§ 667.5, subd. (b)).

The jury acquitted Aguilar of the attempted murder allegations in counts 1 and 2, but convicted him of assault with a semiautomatic firearm on a peace officer as a lesser included offense. (§ 245, subd. (d)(2).) The jury failed to reach a verdict on counts 3 and 4. The jury convicted Aguilar as charged on counts 5 through 14.

After receiving a determinate sentence of 125 years plus an indeterminate term of 90 years to life,[2] Aguilar filed the present appeal from the judgment. He contends (1) the trial court conducted an inadequate posttrial hearing on a juror misconduct allegation, and (2) the evidence at trial was insufficient to sustain the gang enhancement allegations. Finding no error, we affirm.

---

[1]     All further undesignated statutory references are to the Penal Code.
        Aguirre is not a party to this appeal.

[2]     On the six attempted murder counts (5-8, 13 & 14), Aguilar received six consecutive terms of 15 years to life, plus six consecutive 20-year terms for the personal gun use enhancement. On count 9, Aguilar received a consecutive two-year term for evading an officer, plus three years for the gang enhancement. On counts 1, 2, and 11, sentence was imposed but stayed pursuant to section 654.

# BACKGROUND

## I.    The May 24, 2008 Incident

On May 24, 2008, Los Angeles Police Department Officers Dontae Phillips and Kristina Ramirez were patrolling in North Hollywood when they spotted a Nissan Altima with paper license plates.  The officers had been told to be on the lookout for stolen cars with paper license plates.  As the officers shined a spotlight on the Altima, which was double parked, a man who was leaning into the front passenger window (later identified as defendant Aguilar) dove into the Altima, which "took off right away."

The officers pursued the Altima with their lights and siren on.  Aguilar pointed a gun through the Altima's sunroof and fired several shots at the patrol car.  The shots caused the patrol car to back off, which allowed the driver of the Altima (later identified as defendant Aguirre) to stop the car.  When Aguilar opened the front passenger door, Ramirez stopped the patrol car and Phillips got out.  Aguilar fired several shots at Phillips, who returned fire.  Aguilar and Phillips got back into their respective vehicles and the pursuit resumed.

The Altima eventually came to a halt after crashing into a gate.  Aguirre jumped out and ran away.  While the officers were following Aguirre in their patrol car, Aguilar, who was behind the patrol car, fired several shots at the officers.  At least one round hit the patrol car.

As Aguilar fired at the officers and kept them inside the patrol car, Aguirre, who had dropped to the ground in front of the patrol car, was able to get up and run away.  Aguilar also ran away but was confronted by a second patrol car, which arrived as backup.  Aguilar assumed a shooting stance and fired several shots at the second patrol car, which was heading straight at him.  An officer fired several shots at Aguilar from the second patrol car.  Aguilar ran out of ammunition, threw the gun to the ground, and surrendered.

3

Aguirre was apprehended and treated for a gunshot wound to the leg. Aguilar was treated for scrapes and abrasions.[3]

During the booking process, Aguirre said something to Aguilar in Spanish. Aguilar replied, "I did it all. I was the shooter." Aguilar tested positive for gunshot residue; Aguirre tested negative.

## II.    The Prosecution's Gang Expert

The prosecution's gang expert, Daniel Fournier, testified that Aguilar and Aguirre were active members of the Vineland Boyz, a criminal street gang. Fournier explained that the Vineland Boyz have a particular hatred for the Los Angeles and Burbank Police Departments that began in 2003, when a Vineland Boyz member (Ramon Aranda or "Munchie") and a Burbank police officer (Officer Pavelka) were killed in a shootout. Officer Pavelka's death led to the creation of a task force that sought to put the Vineland Boyz "out of business." The task force arrested a hundred Vineland Boyz members and obtained convictions against 40 of the gang's "[o]riginal gangsters" or "hardcore" members on federal racketeering charges. The arrests and convictions "interrupted" the gang's "drug trade" and "fractionalized" its membership. As a result, the Vineland Boyz harbor an "extreme hatred" for the Los Angeles and Burbank Police Departments, which is expressed in their graffiti and tattoos.

In Fournier's opinion, the most "hardcore" method to earn respect in the gang culture is to "go after a police officer." When a gang displays a "willingness to shoot it out with the police," it earns respect from other gangs and within the prison system.

Fournier was presented with a hypothetical that mirrored the facts of this case. He testified that in his opinion, the driver and passenger were gang members who were working in concert during the entire incident to benefit their gang. Shooting at police officers benefits a gang by creating fear and intimidation within the community, discouraging witnesses from reporting crimes or cooperating with the police, and

---

[3]    A third individual, Pauline Lopez, was found in the back passenger seat of the Altima.

enhancing the gang's reputation within the prison system. For a gangster, the ultimate crime is killing a police officer.

### III.     The Defense Evidence

Both defendants testified at trial. Aguirre admitted that he was the driver and Aguilar admitted that he was the shooter in the May 24, 2008 incident. The mutual defense theory was that defendants were trying to evade arrest but were not trying to injure or kill anyone.

Aguirre testified as follows: He belongs to the Vineland Boyz and was on parole when this incident occurred. He was driving the Altima in an attempt to get away from the police because he did not want to be sent to prison for being in a stolen car. He heard gunshots during the pursuit but did not know who was shooting. He did not fire any shots during the incident.

Aguilar testified as follows: He belongs to the Vineland Boyz and has known Aguirre for 10 years. When this incident occurred, Aguilar was on parole and had a gun in his possession. During the pursuit, Aguilar "stuck [his] hand" "through the sunroof" and "shot" at the police. Aguilar was only trying to "scare" the officers so that he and Aguirre could "evade the police and get away." Initially, the plan worked. When the patrol car backed off, Aguirre stopped the Altima and Aguilar opened the passenger door in order to get out and run. Before Aguilar could run away, the patrol car "caught up" and "started shooting." Aguilar "stood up and fired another like four shots," because "if someone is firing a gun at you, you've got to make them stop. I was trying to make them stop a little bit."

When the pursuit resumed, Aguilar "stood up" in the moving car and fired a few more rounds. Aguilar did not fire "with the intention of hitting the police vehicle." He was only trying to get the police vehicle "to back up."

After Aguirre crashed the Altima, Aguilar jumped out and ran to some parked trucks, but soon realized that it was not "a good hiding place." Aguilar stood up and began firing at Phillips and his partner in order "[t]o make them stop." Aguilar was

5

running away when he saw "another police car." Aguilar fired several more shots to get "them to stop."

On cross-examination, Aguilar admitted that he had initiated the shooting. Aguilar testified that he was aware of the 2003 shooting deaths of Officer Pavelka and a "Vineland boy." He was also aware that if fired upon, the police are trained to fire back and not run away.

## IV. The Juror Misconduct Hearing

The trial court received the jury's verdict and dismissed the jury on February 28, 2011. Two weeks later, the trial court received a letter from juror number 2, the foreperson, dated March 16, 2011.

The trial court held a hearing at which it informed the prosecution and defense counsel of juror number 2's letter. The trial court stated in relevant part: "This letter, in the court's opinion, kind of goes all over the place and it makes a couple of suggestions that trouble me in a sense that at one point she says basically something to the effect that I [the trial judge] had to go on vacation and another thing she basically says I was rushing them. I have been on the bench a long time. One thing I never say to a jury is I'm going on vacation. I say the court is dark. I may in fact encourage [the] lawyers to move along at a nice pace, but I would never say anything in front of a jury that indicates speed is at issue. You made me think before I heard whatever you had to say. It seemed to me she was talking to someone in the audience. How could she come up with that? That was kind of troubling. The salutation at the end is totally different than the letter. And so I think at this point . . . we owe it to ourselves to get clarification."

The trial court invited defense counsel to obtain a declaration from juror number 2, which the court would examine to determine if it raised a possible claim of juror misconduct. Defense counsel submitted juror number 2's declaration dated September 15, 2011, which included the following statement concerning the alleged use of a cell phone during deliberations: "Finally, despite the court's order to refrain from using technology or investigating the case on our own during deliberations with the other

6

jurors there was argument concerning the definition of malice. I explained to them what I believed malice to mean. One of the jurors used her smart phone to find a dictionary definition of malice, read it aloud, and showed it to the jurors. As foreperson, I immediately reminded her that we were not to use technology in any way to enhance our understanding of the case and certainly were not allowed to investigate or research in any way on our own."

After reviewing juror number 2's declaration, the trial court set a December 8, 2011 hearing at which the jurors were requested to appear. The eight jurors who appeared at the December 8 hearing, including juror number 2 and the juror who allegedly used the cell phone, were questioned individually by the trial court. In response to the trial court's questions, seven of the eight jurors (juror numbers 11, 5, 1, 7, 10, 6, and 4) testified that (1) they did not see anyone using a cell phone during deliberations, and (2) no outside information was received via cell phone during deliberations.[4]

The trial court questioned juror number 2 last. In response to the trial court's greeting, "How are you?," she replied, "I'm a little bit upset." She testified that "late" in the deliberations, a female juror with curly hair—who was present at the December 8 hearing—had used her cell phone under the table to look up the word malice. The female juror "said look, it's right here and read the definition of malice off of her online dictionary." "[S]he picked it up and showed it to everybody, and then I yelled at her and she put it away."

At the end of the hearing, the trial court found that "no irregularities" had occurred with regard to a cell phone. In explaining its finding, the trial court referred to juror number 2's March 16, 2011 letter, which indicated that she was unhappy with the verdict but did not refer to any specific statements or words. The trial court stated in relevant part: "[Juror number 2] who just left the courtroom wrote a document dated March 16, 2011. In paragraph 2 of that document, basically a partial quote goes, 'It was clear from

---

**4** Three jurors (numbers 3, 8 & 9) were absent from the December 8 hearing because they had left the state. The remaining juror's absence (juror number 12) is not explained in the record.

7

the first moment that some jurors believed they had the obligation to rubber stamp the prosecution's charges.' Same paragraph, 'I believe this influenced some jurors into thinking that a rush to judgment was preferred by the court.' No specific statements, no specific words were ever quoted in that document. The court has indicated to the attorneys on a number of occasions now that it has read and re-read this document. The court has held this hearing because the court believes there was one outstanding issue that had to be addressed, and we have done that at this point. The court finds that the other statements or allegations, and I won't call them allegations, other statements in this document are not critical. The court believes that this juror clearly, for whatever reasons, was not pleased with the end result in this matter. And I think it would, at least at the conclusion, I believe it's reasonable if one just reads the document itself. Again, for those reasons and the testimony at this particular hearing, the court would find at this point that no irregularities occurred in the deliberations with respect to a cell phone. That will be the court's ruling."

## V.  The New Trial Motion

On January 9, 2012, Aguilar moved for a new trial based on: (1) juror number 2's declaration concerning the alleged use of a cell phone (§ 1181, subds. 2, 3); and (2) insufficient evidence to sustain the gang enhancement allegations. After denying the new trial motion, the trial court imposed sentence. This timely appeal followed.

## DISCUSSION

## I.  Substantial Evidence Supports the Trial Court's Finding That No Irregularity Occurred With Regard to a Cell Phone

Defendant contends the December 8, 2011 hearing was inadequate to determine whether a cell phone was used during deliberations to look up the definition of malice. He contends the questions posed to the jurors—whether "any information came to the jury via cell phone" and whether the jurors saw anyone using a cell phone during

8

deliberations—were too narrowly focused. He contends that a proper inquiry would have included the following additional questions: (1) whether each juror had personally used a cell phone during deliberations; and (2) whether "there was disagreement over the definition of malice and whether or not there was a discussion about malice.'" We reject defendant's contention and conclude the hearing was adequate to determine whether a cell phone was used during deliberations to look up the definition of malice.

On appeal, the trial court's credibility findings will be affirmed if they are supported by substantial evidence. (*People v. Majors* (1998) 18 Cal.4th 385, 417.) In this case, there were solid grounds to support the trial court's determination that juror number 2, who was "not happy" with the verdict, was not credible in her allegation regarding the supposed cell phone incident.

As the trial court pointed out, juror number 2's credibility was undermined by her March 16, 2011 letter. At the initial hearing regarding the March 16 letter, the trial judge stated it was troubled by the letter's "suggestions" that the judge "had to go on vacation" and "was rushing them." The trial judge expressly denied both "suggestions," stating, "I have been on the bench a long time. One thing I never say to a jury is I'm going on vacation. I say the court is dark. I may in fact encourage [the] lawyers to move along at a nice pace, but I would never say anything in front of a jury that indicates speed is at issue."

At the December 8 hearing, the trial court conducted a proper inquiry to determine whether any outside information was obtained via cell phone. The failure to ask whether each juror had personally used a cell phone during deliberations was not improper. An affirmative response to that question would have simply led to the question that was posed to each juror: Was outside information received via cell phone during deliberations? The purpose of the December 8 hearing was not to determine whether someone had used a cell phone, but whether the use of a cell phone had resulted in the receipt of outside information. The court's inquiry satisfied that purpose. Asking whether there was a dispute concerning the word malice would not have assisted

defendant because, as the trial court correctly pointed out, the jury is entitled to have such a disagreement.

The bottom line is that at the December 8 hearing, seven jurors denied under oath that any outside information was obtained via cell phone. Because the trial court believed their testimony, the record contains substantial evidence to support the finding that no irregularity occurred with regard to the use of a cell phone. Accordingly, no further inquiry concerning juror number 2's declaration was required and the motion for new trial was properly denied.

## II.     Substantial Evidence Supported the Gang Enhancement Allegations

Defendant contends that Fournier's expert testimony was insufficient to support the specific intent element of the gang enhancement statute. To satisfy the specific intent element, the statute requires a finding that the defendant committed the crime "with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1).)

Defendant's contention that the specific intent element was not satisfied in this case is based on *In re Frank S.* (2006) 141 Cal.App.4th 1192 (*Frank S.*) and *People v. Ramon* (2009) 175 Cal.App.4th 843 (*Ramon*). Both cases are readily distinguishable.

In *Frank S.*, the juvenile court sustained one count of carrying a concealed dirk or dagger (§ 12020, subd. (a)(4)) and found the gang enhancement allegation to be true (§ 186.22, subd. (b)(1)). The appellate court reversed the true finding on the gang enhancement, finding the evidence insufficient to show the minor was carrying the knife "with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1).) The appellate court explained: "The prosecution did not present any evidence that the minor was in gang territory, had gang members with him, or had any reason to expect to use the knife in a gang-related offense. In fact, the only other evidence was the minor's statement to the arresting officer that he had been jumped two days prior and needed the knife for protection. To allow the expert to state the minor's specific intent for the knife without any other substantial evidence opens the

10

door for prosecutors to enhance many felonies as gang-related and extends the purpose of the statute beyond what the Legislature intended." (141 Cal.App.4th at p. 1199.)

In *Ramon*, the jury convicted the defendant of receiving a stolen vehicle, possession of a firearm by a felon, carrying a loaded firearm while a member of a criminal street gang, and carrying a loaded firearm for which he was not the registered owner. The jury also found the gang enhancement allegations to be true. (§ 186.22, subd. (b)(1).) On appeal, the appellate court found the evidence insufficient to support the specific intent requirement of the gang enhancement statute. The appellate court rejected the People's argument that the defendant's presence in a stolen vehicle, with another gang member, while in gang territory, was sufficient to establish that the crime was committed with specific intent to promote, further, or assist criminal conduct by gang members.[5]

In both *Frank S.* and *Ramon*, the defendant was carrying a weapon, but did not use the weapon to commit a crime. In this case, however, Aguilar was carrying a weapon that he fired multiple times to evade the police during the stolen vehicle pursuit and later to distract the police to assist fellow gang member Aguirre, who was on the ground in front of the patrol car, to get up and run away. We find the evidence in this case was sufficient to establish the specific intent requirement of the gang enhancement statute.

---

[5] In *People v. Ochoa* (2009) 179 Cal.App.4th 650, the appellate court criticized the *Ramon* court's insufficiency analysis, stating: "the statute requires only that a defendant act 'with the specific intent to promote, further, or assist in any criminal conduct by *gang members* . . . .' (§ 186.22, subd. (b), italics added.) We would find the evidence in *Ramon* sufficient to meet the specific intent prong of the statute." (179 Cal.App.4th at p. 661, fn. 6.)

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

SUZUKAWA, J.

We concur:

EPSTEIN, P. J.

MANELLA, J.

12